J-A14026-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| NICOLE S. JUNIOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CHANEL E. GLOVER | : | |
| | : | |
| Appellant | : | No. 2111 EDA 2025 |

Appeal from the Order Entered July 14, 2025
In the Court of Common Pleas of Philadelphia County Domestic Relations
at No(s): 0C2201448

BEFORE: DUBOW, J., NICHOLS, J., and MURRAY, J.

MEMORANDUM BY MURRAY, J.: **FILED JULY 15, 2026**

Chanel E. Glover (Appellant) appeals from the order that (1) granted the petition for contempt of custody (contempt petition) filed by Appellant's ex-wife, Nicole S. Junior (Junior); (2) found Appellant in civil contempt of the trial court's temporary custody order dated April 9, 2025, which pertained to custody of the parties' son born in May of 2022, E.G. (Child or the Child); and (3) ordered Appellant to pay a sanction of $500 and to reimburse Junior's attorney's fees, associated with litigating the contempt petition, in the amount of $2,500. Appellant asserts the contempt finding constituted an abuse of the trial court's discretion and that the sanctions, which were unsupported by the record and unreasonable, exhibited the court's bias and ill-will toward Appellant. After careful consideration, we affirm.

Much of the factual and procedural history of this contentious litigation is not pertinent to this appeal. The protracted history is competently explained in both the trial court's Pa.R.A.P. 1925(a) opinion, *see* Trial Court Opinion, 12/11/25, at 2-5, and our Supreme Court's landmark decision in this matter, *Glover v. Junior*, 333 A.3d 323 (Pa. 2025).

In short, the parties entered into a same-sex marriage in January 2021. *Glover*, 333 A.3d at 327. Shortly after the marriage, the parties decided to pursue conception of a child via *in vitro* fertilization (IVF), and jointly entered into a contract with a sperm donation clinic. *Id.* "In August of 2021, Child was conceived *via* IVF using [Appellant's] egg and the sperm from" the clinic. *Id.* at 328. Prior to Child's birth, both parties retained counsel and signed a representation agreement in November of 2021, "in anticipation of Junior's 'Confirmatory Step-Parent Adoption' of Child." *Id.* One month later, both parties signed affidavits expressing their intent for Junior to adopt Child. *Id.* Appellant attested, *inter alia*, "I am seeking to have my spouse, [Junior,] adopt this child"; and "I understand that this means [Junior] will become a legal parent, with rights **equal** to my rights as a biological parent[.]" *Id.* (emphasis added by *Glover*; citation omitted).

"Over the next few months, the parties' relationship deteriorated." *Id.* In March of 2022, Appellant informed Junior that Appellant no longer intended to proceed with Junior's adoption of Child. *Id.* at 329. Shortly thereafter, Appellant filed a complaint in divorce. *Id.*

A few weeks prior to Child's birth, Junior filed a petition for special relief (Parentage Petition) seeking a pre-birth establishment of Junior's status as Child's legal parent.[1] *Id.* The trial court conducted an evidentiary hearing on May 3, 2022, and, the following day, entered an order granting Junior's Parentage Petition. *Id.* Appellant timely appealed to this Court. Appellant gave birth to Child on May 25, 2022.

After an initial panel decision in Appellant's favor, which was subsequently withdrawn, this Court certified the matter for rehearing *en banc*. *See id.* at 330 (detailing the proceedings). The *en banc* Court affirmed the order granting Junior's Parentage Petition. *See generally Glover v. Junior*, 306 A.3d 899 (Pa. Super. 2023) (*en banc*). Our Supreme Court subsequently granted Appellant's petition for allowance of appeal. *Glover*, 333 A.3d at 336.

The Supreme Court affirmed this Court's decision that "Junior is Child's legal parent[.]" *Id.* at 358. In its watershed decision, the *Glover* Court held that "intent-based parentage accords with public policy, … [and] parentage may be established by proof of intent shared by two parties to use [assisted reproductive technology] to conceive and co-parent a child together, even without meeting all the formalities of contract law." *Id.* at 356; *see also id.*

---

[1] Shortly prior to Child's birth, Junior also filed a custody complaint under the instant docket. Junior sought an award of shared legal and physical custody upon Child's birth. Complaint for Custody, 5/23/22 (Prayer for Relief). Junior subsequently filed an amended custody complaint on June 7, 2022. Appellant filed preliminary objections to the custody complaint on June 13, 2022, which the trial court subsequently overruled.

at 353 ("Our current law clearly establishes biology is not the end-all-be-all when it comes to furthering the interests of legal parentage." (footnote omitted)).

In its Rule 1925(a) opinion, the trial court explained what ensued thereafter:

> Following the Supreme Court's decision, Junior's custody complaint was scheduled for [a] hearing on April 9, 2025. Counsel for [Appellant] submitted a continuance request … asserting that [Appellant] still had an appeal period of ninety days; the request was denied. N.T.[,] 4/9/2025, at 6. Both parties and counsel appeared on April 9th. At the time of the hearing, the Child was nearly three years old and residing exclusively with [Appellant]. In fact, Junior had never seen nor met the Child, who was born on May 25, 2022.[FN1] The court took testimony from both parties and deemed it appropriate to order supervised physical custody due to the lack of contact between Junior and the Child. *Id.* at 18-19. The court ultimately determined it was best for the parties to use a professional third-party supervisor. Rachel Curry (hereinafter "Curry") was suggested by both parties as an appropriate supervisor. *Id.* at 31. [Appellant], apparently resistant to permitting Junior to exercise any parenting time whatsoever, attempted to advocate to be present during Junior's supervised physical custody because [Appellant] was concerned dropping the Child off with a stranger would have an impact on the "strong bond" between [Appellant] and the Child. *Id.* at 28. The court stated that the process of integrating Junior into the Child's life had to start somewhere and determined that [Appellant's] presence during the sessions would likely cause them to go poorly. *Id.* [Appellant's] representation that the Child had various activities on weekdays and was on a schedule further demonstrated [Appellant's] reluctance to accommodate Junior's court-ordered supervised physical custody. *Id.* at 50-51.

---

[FN1] The court notes that as of the April 9, 2025, hearing date, no order awarding custody of the Child had ever been entered. Junior's parentage of the Child was established by the trial court's order dated May 4, 2022, which was in effect for the vast majority of time between the Child's birth and the April 9, 2025, hearing

date. The only time frames during which the order establishing Junior as a parent was not in effect were as follows: (1) from June 17, 2022, when the Superior Court temporarily stayed the May 4, 2022, order pending briefing until July 18, 2022, when the Superior Court lifted its stay of four out of the five provisions of the trial court order; and (2) from the date of the Superior Court panel decision dated February 24, 2023, until April 17, 2023, when the Superior Court granted rehearing *en banc* and withdrew the panel decision.

Trial Court Opinion, 12/11/25, at 5-6 (footnote in original; some capitalization and punctuation modified).

On April 9, 2025, the trial court entered a temporary order of custody (Custody Order). The Custody Order awarded Appellant sole legal custody and primary physical custody of Child, subject to Junior's periods of supervised partial custody. Custody Order, 4/9/25, ¶¶ 1-2. Specifically, Junior would exercise custody every Wednesday, from 10:00 a.m. to noon, as well as one weekend day every week (the day to be agreed upon by the parties), from 10:00 a.m. to noon. *Id.* ¶ 3. The Custody Order provided that Junior's visits would be supervised by Curry, at the parties' shared expense. *Id.* ¶ 4. Finally, the Custody Order scheduled a hearing on the parties' respective pending motions for June 26, 2025. *Id.* ¶ 6.

In its opinion, the trial court detailed the parties' interactions with Curry:

Counsel for Junior contacted Curry on April 11, 2025, inquiring about [Curry's] services and availability, copying opposing counsel to the e-mail. *See* Ex. P-2. Curry's availability coincided with the Wednesdays and Sundays specified by the [] Custody Order and, based on that availability, Curry was provided with a list of corresponding dates until the next court listing by Junior's counsel. *See* Ex. P-4, at 1-3; N.T., 6/26/2025, at 14-15. Curry indicated the only dates she would not be available from that list

would be Sunday, April 13th and Sunday, April 20th. **See** Ex. P-4, at 4; N.T., 6/26/2025, at 15. Following that exchange, on April 12, 2025, Curry informed [the parties' respective] counsel [that] she would need to have an intake call with each parent to review guidelines, rules, demographic information, and the case history prior to supervised custody starting. **See** Ex. P-4, at 5; N.T., 6/26/2025, at 16.

During the initial intake process, [**Appellant**] **contacted Curry and informed her** [**that Appellant**] **would not be producing the Child for several of the scheduled dates due to alleged pre-planned activities.** **See** Ex. P-4, at 19; N.T., 11/26/2025, at 92. The pre-planned activities, according to [Appellant], consisted of a running program the Child was signed up for, another child's birthday party, and family events with people [Appellant] referred to as the Child's "village." N.T., 6/26/2025, at 50, 136-39. By April 17, 2025, [Appellant] had only agreed to one make-up day for the dates that [Appellant] declared would be missed. **See** Ex. P-4, at 20.

By April 15, 2025, both intakes for Junior and [Appellant] had been completed and Curry was available and ready to start supervised custody the following day, on Wednesday, April 16th. N.T., 6/26/2025, at 21. Each party also signed guidelines provided by Curry. **See** Ex. P-3; N.T., 6/26/2025, at 8-9. The guidelines provided a number of rules, including that: (1) both parties must follow the orders set forth by the court and Curry; (2) dates and times set forth shall be followed; (3) the custodial parent shall not be in view during the visits and must leave the premises where the visit is occurring; and (4) unless otherwise indicated in a court order, neither party shall dictate visit location, and in the case of a dispute regarding location, Curry would make the final decision. **See** Ex. P-3.

**Despite Curry being available and each parent's intakes being completed,** [**Appellant**] **failed to produce the Child for the first supervised physical custody session on April 16, 2025.** N.T., 6/26/2025, at 21. [Appellant] told Curry [that Appellant] did not wish to have the first period of supervised physical custody on April 16th. **Id.** [Appellant] also advised that since there was a dispute about the location for [the] April 16th [visit, Appellant] would not be producing the Child. **Id.** at 135-36. Both [Appellant] and Junior had provided suggestions for the location of supervised custody. **See** P-4, at 18; N.T., 6/26/2025,

at 116. Curry rejected [Appellant's] suggestion of the Luddington Library for the first session, as she felt Junior's suggestion of the Please Touch Museum to be more appropriate. N.T., 6/26/2025, at 116. Counsel for [Appellant] also maintained that because there was no "start date" in the [] Custody Order, [Appellant] was not obligated to produce the Child beginning on April 16th. *See* Ex. P-4, at 8, 17; N.T., 6/26/2025, at 18-19. Curry had informed both [Appellant] and [Appellant's] counsel that in [Curry's] experience, if there was no specific start date, the date the supervised services were to begin was the date the order was signed. *See* Ex. P-4, at 17. Further, at no point was it alleged that the scheduled April 16th supervised physical custody session did not happen due to an emergency or illness. N.T., 6/26/2025, at 88.

Plans were made for a supervised custody session to occur on April 19, 2025, at the Please Touch Museum. *See* Ex. P-4, at 21. Until that date, Junior had never met the Child, who would be three years old one month later.

Trial Court Opinion, 12/11/25, at 7-9 (emphasis added; some capitalization, punctuation, and citations modified).

On April 21, 2025, Appellant filed a motion for reconsideration of the Custody Order. Appellant claimed not to have exhausted all appeal rights, *i.e.*, to the United States Supreme Court, prior to the entry of the Custody Order. Motion for Reconsideration, 4/21/25, ¶¶ 5, 10. Appellant further asserted that a psychological and custody evaluation should be completed before Junior was granted any custodial time. *Id.* ¶¶ 8, 10.

Appellant complained that Junior "is asking for shared custody of a child … with whom [Junior] has no relationship, no bond, and, in fact, has never even met." *Id.* ¶ 7 (punctuation modified); *see also* Trial Court Opinion, 12/11/25, at 9 (trial court observing that Appellant's petition for

reconsideration "continued to characterize Junior's attempts to obtain custody of the Child as aggressive, and averred Junior believed [that Junior was] entitled to a relationship with a child [whom Junior] did not know and to whom [Junior] provided no financial or emotional support."). Appellant further asserted the trial court "is putting the interests of [] Junior ahead of those of the Child and has not had an expert's opinion on what is in the Child's best interests at this stage[.]" Motion for Reconsideration, 4/21/25, ¶ 10(c) (capitalization modified); *see also id.* ¶ 10(m) (Appellant arguing, "[t]his case requires a very careful process, delineated by experts in the field, and not just a haphazard order accommodating one litigant").

Also on April 21, 2025, Junior filed the instant contempt petition. Junior asserted Appellant was in violation of the Custody Order by (1) failing to produce Child for the scheduled supervised custody session on April 16, 2025; and (2) indicating, in advance, that Appellant would not produce Child for several court-ordered supervised custody dates. Contempt Petition, 4/21/25, ¶¶ 11-12, 16. Junior proposed that if Appellant "cannot comply with the schedule as set forth by the court, [Junior] should be granted overnight, unsupervised custodial time on the occasions that [Appellant] refuses to comply." *Id.* ¶ 18. Finally, Junior requested the trial court to order Appellant to reimburse Junior for Junior's attorney's fees incurred in connection with the contempt petition. *Id.* (Prayer for Relief).

The trial court consolidated Junior's contempt petition with the custody complaint, which was already listed for hearing on June 26, 2025. On April 23, 2025, the trial court denied Appellant's motion for reconsideration.

At the hearing on June 26, 2025 (contempt hearing), both parties and their respective counsel appeared.[2] Junior presented testimony from Curry.[3] Appellant also testified.

_____

[2] One day prior to the contempt hearing, Junior filed an amended petition for contempt. Junior asserted that

> [i]n the short time since [Junior] filed a contempt petition on April 21, 2025, additional information has come to light involving [Appellant's] intentional interference with [Junior's] supervised visits with [Child]. Of the twenty-two scheduled supervised visits that [Junior] was entitled to have with [Child] since entry of the [Custody Order, Appellant] has canceled twelve of those visits.

Amended Petition for Contempt, 6/25/25, ¶¶ 5-6 (paragraph enumeration omitted); *see also id.* ¶ 19 (Junior asserting that Appellant "is clearly thwarting [Junior] from spending time with [Child], and therefore depriving [Child] of a relationship with his parent."). The trial court did not address the amended petition for contempt at the contempt hearing, nor is it implicated in the instant appeal.

[3] The trial court stated in its opinion that "[a]t the conclusion of direct examination, Curry informed the [c]ourt she was no longer willing to work with the family because [Appellant] made an official complaint against her to the state social work board." Trial Court Opinion, 12/11/25, at 11 n.4 (citing N.T., 6/26/25, at 114). The court further explained that at the contempt hearing, Appellant "attempted to call a witness purporting to be an expert on how the case should be moved forward to transition the Child to custodial time with Junior." *Id.* at 12 n.5 (citing N.T., 6/26/25, at 114). However, the trial court "declined to hear from" Appellant's proffered expert witness, since "the witness was not proffered … prior to the entry of" the Custody Order. *Id.*

Following the contempt hearing, Appellant filed an answer to the contempt petition. Appellant also filed a post-hearing memorandum urging the trial court to deny the contempt petition.

On July 14, 2025, the trial court entered the order that forms the basis of this appeal.[4] The court found Appellant in civil contempt[5] of the Custody Order and ordered Appellant to pay a $500 sanction and Junior's attorney's fees in the amount of $2,500.[6]

_____

[4] On the same date, the trial court entered a separate temporary order of custody. The order, *inter alia*, awarded the parties shared legal and physical custody. Temporary Order of Custody, 7/14/25, ¶¶ 1, 10. Appellant appealed the order, at docket 1849 EDA 2025, after which this Court, *sua sponte*, quashed the appeal as interlocutory. The temporary order of custody is not implicated in this appeal.

[5] It is undisputed that the trial court found Appellant in civil, as opposed to criminal, contempt. As this Court has stated,

> [t]he distinction between criminal and civil contempt is [] a distinction between two permissible judicial responses to contumacious behavior. …. [W]here the act of contempt complained of is the refusal to do or refrain from doing some act ordered or prohibited primarily for the benefit of a private party, proceedings to enforce compliance with the decree of the court are civil in nature. The purpose of a civil contempt proceeding is remedial.

*Lachat v. Hinchliffe*, 769 A.2d 481, 487-88 (Pa. Super. 2001) (internal citations omitted); *see also id.* (explaining criminal contempt).

[6] The order further provided that Junior's amended petition for contempt would be considered by the court during a custody trial that was scheduled to begin on September 25, 2025. The instant appeal implicates neither Junior's amended petition for contempt nor the custody trial.

- 10 -

This timely appeal followed. Both Appellant and the trial court have complied with Pa.R.A.P. 1925.[7]

On appeal, Appellant presents two issues for our consideration:

1. Did the trial court err as a matter of law when it found Appellant in contempt of the [Custody] Order?

2. Did the trial court err as a matter of law by ordering Appellant to pay $500 as a sanction and $2,500 in counsel fees as a result of the contempt finding?

Appellant's Brief at 3 (punctuation and capitalization modified).[8]

Appellant first asserts the trial court erred and abused its discretion in finding Appellant in civil contempt of the Custody Order, where Appellant engaged in no intentional, contemptuous conduct, and the trial court's statements during the contempt hearing exhibited its bias and ill-will toward Appellant. *See id.* at 13-21. Appellant contends "there was no wrongful

_____

[7] In its thorough Rule 1925(a) opinion, the trial court observed that

[t]his custody matter remains pending with the trial court …. Since June 26, 2025, multiple petitions—including four additional petitions for contempt filed by Junior—have been docketed and the [c]ourt has held three days of trial, and it intends to hold at least one more before making a final custody determination and ruling on the additional petitions.

Trial Court Opinion, 12/11/25, at 12 n.6 (punctuation modified).

[8] Junior's counsel filed correspondence in this Court announcing that Junior would not be filing an appellee's brief. Correspondence, 2/12/26. Junior's counsel subsequently filed a praecipe to withdraw as counsel, wherein Junior announced Junior's intent to proceed *pro se*. **See generally** Praecipe for Withdrawal, 5/13/26.

intent" in Appellant's actions and, therefore, "a finding of contempt was not supported by the evidence." *Id.* at 20. "Further, even with one missed visit, [*i.e.*, on April 16, 2025,] a mere showing of non-compliance is insufficient for a finding of contempt." *Id.* Appellant claims to have been "seemingly punished for very little to do with a missed visit on April 16, 2025. Moreover, strict construction of the [Custody O]rder left in question the date of the first visitation would start[.]" *Id.*; *see also id.* at 19-20 (Appellant lamenting that at the contempt hearing, "the trial judge scolded [Appellant's] counsel repeatedly, not for actions by [Appellant] related to the [Custody] Order, but for things like choice of wording in [Appellant's] motion for reconsideration." (capitalization modified)).

> According to Appellant, at the contempt hearing,
>
> the trial [court] did admit that in this circumstance that [Appellant] was the victim of various miscommunications rather than any act of wrongful intent in any perceived violations of the [Custody O]rder. This supports the fact that there was no wrongful intent by [Appellant] in this instance and that a finding of contempt was not supported by the evidence.

*Id.* (citing N.T., 6/26/25, at 87 (trial court stating to Appellant's counsel, "there seems to be a lot of miscommunications, and there seems to be a lot of explanation for inappropriate language that comes after the fact, when you get called out on it.")).

"Our standard of review over findings of contempt in the trial court is 'extremely narrow.'" *Fetzer v. Fetzer*, 336 A.3d 1058, 1064 (Pa. Super. 2025) (quoting *In re Davis*, 302 A.3d 166, 180 (Pa. Super. 2023) (*per*

*curiam*)).  This Court has explained that, in reviewing contempt orders, we must consider that

> [e]ach court is the exclusive judge of contempts against its process.  The contempt power is essential to the preservation of the court's authority and prevents the administration of justice from falling into disrepute.  When reviewing an appeal from a contempt order, the appellate court must place great reliance upon the discretion of the trial judge. ….  We are limited to determining whether the trial court committed a clear abuse of discretion.

***Barna v. Langendoerfer***, 246 A.3d 343, 346 (Pa. Super. 2021) (citation omitted); ***see also MacDougall v. MacDougall***, 49 A.3d 890, 892 (Pa. Super. 2012) (stating that this Court "will reverse a trial court's order [ruling upon] a civil contempt petition only upon a showing that the trial court misapplied the law or exercised its discretion in a manner lacking reason."). "In considering an appeal from a contempt order, great reliance must be placed upon the discretion of the trial judge." ***Bold v. Bold***, 939 A.2d 892, 894-95 (Pa. Super. 2007) (citation omitted)).

In civil contempt proceedings, "the burden of proof rests with the complaining party to demonstrate that the defendant is in noncompliance with a court order." ***MacDougall***, 49 A.3d at 892.  To prove civil contempt, the complainant must establish, by a preponderance of the evidence, that "(1) the contemnor had notice of the specific order or decree which [s]he is alleged to have disobeyed; (2) the act constituting the contemnor's violation was volitional; and (3) **the contemnor acted with wrongful intent**." ***Id.*** (emphasis added); ***see also Raker v. Raker***, 847 A.2d 720, 724 (Pa. Super.

2004) (stating that "the preponderance of evidence standard is defined as the greater weight of the evidence, *i.e.*, [enough] to tip a scale slightly[.]"). "Nevertheless, a mere showing of noncompliance with a court order, or even misconduct, is never sufficient alone to prove civil contempt." ***Thomas v. Thomas***, 194 A.3d 220, 226 (Pa. Super. 2018) (citation and quotation marks omitted); ***see also Sutch v. Roxborough Mem'l Hosp.***, 142 A.3d 38, 68 (Pa. Super. 2016) (stating that "the act constituting the violation must be deliberate, and the act of the alleged contemnor must have been done with improper intent." (citations omitted)).

The elements of civil contempt may be proven by circumstantial evidence and logical inferences from the facts. ***Commonwealth v. Reese***, 156 A.3d 1250, 1258 (Pa. Super. 2017).

> [W]hen making a determination regarding whether a defendant acted with wrongful intent, the court should use common sense and **consider context**, and **wrongful intent can be imputed to a defendant** by virtue of the substantial certainty that h[er] actions will violate the court order.

***Gross v. Mintz***, 284 A.3d 479, 492-93 (Pa. Super. 2022) (citing ***Reese***, 156 A.3d at 1258) (emphasis added). "Because the order forming the basis for civil contempt must be strictly construed, any ambiguities or omissions in the order must be construed in favor of the contemnor." ***K.M.G. v. H.M.W.***, 171 A.3d 839, 846 (Pa. Super. 2017) (citation and brackets omitted).

Further, it is established that "[a]ssessments of credibility and conflicts in evidence are for the trial court to resolve; this Court is not permitted to

- 14 -

reexamine the weight and credibility determinations or substitute our judgments for those of the factfinder." ***O.H. Bel Air Partners LP v. Hinton***, 296 A.3d 1173, 1175 (Pa. Super. 2023) (citation omitted). "This Court defers to the credibility determinations of the trial court with regard to the witnesses who appeared before it, as that court has had the opportunity to observe their demeanor." ***Harcar v. Harcar***, 982 A.2d 1230, 1236 (Pa. Super. 2009) (citations and brackets omitted); ***see also Luminella v. Marcocci***, 814 A.2d 711, 716 (Pa. Super. 2002) ("Because the trial court conduct[s] its evidence-balancing test from a vantage point of being able to gauge the credibility of witnesses and assign weight to evidence as it was presented, its opinion is entitled to a measure of deference.").

Enforcement of custody orders through the contempt process is provided for in Pennsylvania Rule of Civil Procedure 1915.12. ***Goodman v. Goodman***, 556 A.2d 1379, 1389 (Pa. Super. 1989) (citing Pa.R.C.P. 1915.12). "A court may exercise its civil contempt power to enforce compliance with its orders for the benefit of the party in whose favor the order runs but not to inflict punishment." ***Sinaiko v. Sinaiko***, 664 A.2d 1005, 1009 (Pa. Super. 1995).

Instantly, in its Rule 1925(a) opinion, the trial court determined it acted within its discretion in finding Appellant in civil contempt of the Custody Order:

> The court did not err in finding a violation of the … [Custody] Order by a preponderance of the evidence because there was evidence sufficient to support the finding. It was not contended that [Appellant] did not have notice of the [Custody] Order, and

- 15 -

[Appellant's] own actions and admission[s] support a finding of a volitional violation and wrongful intent. One of [Appellant's] positions is, because the [Custody] Order had no specific "start date," [Appellant] was not obligated to produce the Child for a supervised custody session on Wednesday, April 16, 2025, the date of the alleged violation. This argument was propounded by [Appellant's] counsel, both at [the contempt] hearing and in e-mail messages to the custody supervisor, [] Curry. [Appellant] further testified [that] because there was still a dispute regarding [the] location of supervised custody, [Appellant] did not produce the Child for the April 16th session.

First, Curry testified credibly [at the contempt hearing] that [Appellant] specifically indicated that [Appellant] did not want Junior's supervised custody to start on April 16th. Additionally, [Appellant] and [Appellant's] counsel's assertion that the lack of "start date" absolved [Appellant] of the obligation to produce the Child for supervised custody on April 16th is entirely meritless and **a deliberate attempt to undermine this court's** [**Custody**] **Order.** While no date for the first supervised session was expressly defined in the order, **the order was effective on April 9, 2025, the date upon which it was signed.** Therefore, Junior should have had supervised custody twice a week, on Wednesday and Saturday or Sunday, for a period of two hours, beginning on the earliest possible date that Curry was available.

The court is generally aware of the processes professional supervisors may have regarding intake, billing, and/or scheduling that need[] to occur prior to supervised physical custody sessions occurring. Here, however, each of the parent intakes were completed, and Curry's availability happened to correspond with the days the court ordered for supervised custody, which were Wednesday and Sunday each week. Both parties and [their respective] counsel were informed that Curry was ready and available to start on April 16th. **It was only** [**Appellant's**] **willful failure to produce the Child that prevented the scheduled supervised custody session from occurring.** Alleging that a lack of a "start date" in the [Custody] Order—which was signed and entered on April 9, 2025—imposes no obligation on [Appellant] to produce the Child constitutes a deliberate attempt to defy a court order and it cannot be sustained as a valid defense to a contempt claim.

Trial Court Opinion, 12/11/25, at 15-16 (footnote omitted; emphasis added; some capitalization and punctuation modified).

The trial court additionally determined that the preponderance of the evidence established that Appellant willfully violated the Custody Order:

The court did not err in finding sufficient facts constituting a willful failure on the part of [Appellant] to comply with the [] Custody Order. It is very clear to the court that [Appellant] did not produce the Child on April 16, 2025, because [Appellant] simply *did not want to* produce the Child to Junior and because of the high level of conflict between the parties. There is no evidence whatsoever that there was some sort of emergency circumstance that would have prevented [Appellant] from producing the Child. Curry testified credibly that everything was ready for supervised physical custody to begin on April 16[, 2025], including, contrary to [Appellant's] assertion, the location—but [Appellant] refused to permit supervised custody to happen on that date. Further, [**Appellant's**] **assertion**, by and through [Appellant's] counsel, **that the** [] **Custody Order allegedly lacking a start date somehow renders that order invalid or ineffective, demonstrates an utter lack of recognition of** [**the trial**] **court's authority.** Nothing prevented the April 16th supervised physical custody session from happening other than [Appellant's] willful refusal to produce the Child.

[Appellant's] notice to Curry that the Child would not be produced for several scheduled supervised physical custody sessions due to allegedly pre-planned activities and events, while not in and of itself a violation of the [Custody] Order, goes directly to the court's finding of willful intent. [**Appellant,**] **in no uncertain terms, was indicating that** [Appellant] **intended to violate the Custody Order, regardless of its terms. Those terms provided no allowances for** [Appellant] **to take the Child to pre-planned activities or events instead of scheduled supervised physical custody sessions.**[9] Such

---

[9] The trial court further opined that Appellant's "[p]lacing the importance of [Child's] activities above that of cultivating a relationship between Child and the Child's other parent directly contravenes the [Custody Order]." Trial Court Opinion, 12/11/25, at 24.

conduct, combined with [Appellant's] clear resistance to the April 16th supervised custody session and ultimate refusal to produce the Child for a custody exchange on that date, leads the court to a finding of willful intent to violate the [Custody] Order by [Appellant].

Further, [Appellant] appears to be under the misapprehension that [Appellant] had to either agree to the date of every supervised physical custody session, and the location, in order for the sessions to occur. N.T., 6/26/2025, at 51. This posture could not be more misguided. The court ordered supervised physical custody to occur each week on Wednesday, as well as on either a Saturday or Sunday, with Curry. Once Curry indicated her availability coincided with Wednesdays and Sundays, those were the days the sessions were to occur. Anything else that needed to happen before supervised physical custody could begin was in the hands of the supervisor, and these tasks were completed prior to April 16th.

The court further notes that each parent in this matter has advanced educational backgrounds. [Appellant], in fact, has a law degree. *Id.* at 129-30. The court will not insult the intelligence of [Appellant] by finding that [Appellant] is unable to read the terms of a court order or that [Appellant] is unable to understand the importance of a court order and the consequences of noncompliance. The court concludes that [Appellant] was well aware of and had a full understanding of the terms of the April 9, 2025, Custody Order, but nevertheless, [Appellant] voluntarily elected to violate the order and further stated [Appellant's] intent not [to] comply with the order in the future.

*Id.* at 17-19 (italic emphasis in original; bold emphasis and footnote added;

original footnote omitted; some capitalization and citations modified).

The trial court further determined that

[**Appellant's**] **personal issues with Junior and** [**Appellant's**] **absolute refusal to acknowledge Junior as the Child's parent also leads the court to a finding of willful intent to violate the** [**Custody**] **Order.** [At the contempt hearing, Appellant] was questioned multiple times, both by counsel and the court, whether [Appellant] viewed Junior as the other mother of the Child. [Appellant's] response when questioned by the court

- 18 -

and opposing counsel was that [Appellant] had "accepted the ruling" and "the Court says that [Junior was the Child's] mother." N.T., 6/26/2025, at 121-22.  When asked if [Appellant] speaks with the Child about Junior, [Appellant] responded that "[Appellant doesn't] talk about" Junior.  *Id.* at 122.  When questioned by [Appellant's] own counsel, [Appellant] changed [Appellant's] testimony and relied on an e-mail [that Appellant] had written to Junior in the early morning of June 26, 2025 (the [contempt] hearing date), to allegedly demonstrate [that Appellant] did view Junior as the Child's parent.  *See* Ex. P-8; N.T., 6/26/2025, at 158-59.  In the e-mail, [Appellant] explicitly states that, "A decision was made by the [Pennsylvania Supreme Court], and while I wholly disagree with the decision, I have fully accepted it."  *See* Ex. P-8.

[Appellant] further testified Junior had emotionally and verbally abused [Appellant] when [Appellant] was pregnant with the Child and had no reason to apologize to Junior, or to take responsibility for [Junior's] not having met the Child until almost three years after the Child was born.  N.T., 6/26/2025, at 65, 151. [Appellant] even suggested that it was Junior's responsibility to reach out during those three years to contribute to the Child's life. *Id.* at 148.  [Appellant] continued to reiterate [that Appellant] was trying to protect the Child, who had not yet connected with Junior, and [stated that Appellant] wanted [Child] to be at the "center of everyone's mind." *Id.* at 51.

[Appellant's] animosity towards Junior is clear and **the court finds [Appellant's] begrudging testimony that [Appellant] accepts Junior as the Child's other parent unconvincing.**  These facts, coupled with [Appellant's] conduct and failure to produce the Child on April 16th, leads the court to the reasonable conclusion that [Appellant] willfully refused to produce the Child for a supervised physical custody session despite the clear terms of the [Custody] Order, and not, as [Appellant] alleges, to protect the Child, but rather to punish Junior.

*Id.* at 19-20 (emphasis added; some punctuation, capitalization, and citations modified).  Finally, the trial court opined that although Appellant maintains

Appellant's "conduct is an effort to protect the Child," the trial court "finds these assertions not credible and self-serving." *Id.* at 24.

Our review discloses that the trial court's foregoing rationale is supported by the record and the law, and we agree with its determination. *See id.* at 17-20, 24.

We are guided by our decision in *Luminella*, *supra*. In that case, the parties were "embroiled in a bitter custody battle" regarding their three minor children. *Luminella*, 814 A.2d at 714 (citation omitted). The trial court entered a custody order awarding the parties shared legal and physical custody. *Id.* The appellant/mother withheld custody from the children's father, in violation of the order. *Id.* at 715, 719. Mother alleged that the children, for various reasons, did not wish to see father and protested that mother "was not able to force the children to see father as the order required." *Id.* at 719. Upon father's petition, the trial court found mother in contempt of the custody order. *Id.* at 715. The court "placed mother on probation for a period of six months, compelled mother to undergo psychological testing, and compelled mother to pay to father a fine of $500.00 plus attorney's fees of $1,000.00." *Id.* at 719.

On appeal in *Luminella*, mother argued, *inter alia*, that "she was not in willful contempt" of the custody order because she (1) could not force the children to visit with father; and (2) feared for the children's safety while they

were in father's custody.  *Id.*  This Court affirmed and rejected mother's claim, reasoning as follows:

> To accept mother's argument is to accept anarchy.  By relying on [mother's] fears for the children's safety as a reason that she could not comply with the court order, mother relies on factors she should have argued during the development of the custody order[.]

*Id.* (capitalization modified); *see also id.* (stating that "[m]other is not permitted to ignore the order and unilaterally institute measures she feels appropriate instead of the order.").  We further concluded that "the trial court's contempt order did not have the effect of punishing mother," as it "served to compensate [father] for mother's violation of his court-mandated rights to custody of his children and, thus, was proper." *Id.*

Instantly, like the situation in *Luminella*, the record evinces that Appellant was in willful violation of the Custody Order.  In challenging the trial court's contempt finding, Appellant essentially asks us to reweigh the evidence, based upon a cold record, which we may not do. *See Robinson v. Robinson*, 645 A.2d 836, 838 (Pa. 1994) (stating that on issues of credibility and weight of the evidence pertaining to custody orders, "appellate courts must defer to the findings of the trial judge who has had the opportunity to observe the proceedings and the demeanor of the witnesses."); *Int. of K.C.*, 310 A.3d 296, 306 (Pa. Super. 2023) ("Even if an appellate court would have reached a different conclusion based on the cold record, we are not in a position to reweigh the evidence and the credibility determinations of the trial

court." (citation and brackets omitted)); ***Shaner v. Harriman***, 189 A.3d 1088, 1090 (Pa. Super. 2018) (in an appeal challenging a contempt finding, stating that "the trier of fact[,] while passing upon the credibility of the witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence." (citation omitted)).

Moreover, the trial court had the authority to rely on circumstantial evidence and inferences to find that Appellant acted with the requisite intent. ***See Reese***, 156 A.3d at 1258. This Court is "not authorized to nullify the fact-finding function of the trial court in order to substitute our judgment for that of the trial court." ***B.K. v. J.K.***, 823 A.2d 987, 990 (Pa. Super. 2003) (citation omitted).

In conclusion, the trial court acted well within its discretion in determining that Junior had satisfied Junior's burden of proving all elements of civil contempt, and in finding Appellant in contempt of the Custody Order. Appellant's first issue merits no relief.

We next address Appellant's second and final issue. Appellant asserts that "not only was there insufficient evidence for a finding of contempt, but there was no basis for the sanctions and fees imposed as compensation due to Junior[.]" Appellant's Brief at 22.

> Without any evidence or documentation provided, the trial court assumed such things as that Junior paid counsel fees for the [contempt] hearing, that Junior paid Curry to testify [at the

> contempt hearing], that [Appellant] is paying three attorneys[10] and that therefore, [Appellant] can afford to pay a $500 fine and $2[,]500 in counsel fees. …. These assumptions have no merit and are not supported by the record or the law of Pennsylvania.

*Id.* (footnote added). Appellant concludes that the sanctions imposed cannot stand because they "were more punitive than coercive or compensatory," and exhibit the trial court's "bias and ill-will" towards Appellant. *Id.*; *see also id.* at 21 (citing *Sutch*, 142 A.3d at 69 (stating that "an award of counsel fees is intended to reimburse an innocent litigant for the expenses the conduct of an opponent makes necessary, such as the cost of the contempt hearing, so it can be coercive and compensatory but it cannot be punitive.")).

Pursuant to section 5323(g) of Pennsylvania's Child Custody Act, "a party who willfully fails to comply with any custody order may … be adjudged in contempt" and ordered to, *inter alia*, pay "a fine of not more than $500" and/or "counsel fees and costs." 23 Pa.C.S.A. § 5323(g)(1)(ii) and (v) (some capitalization modified). This Court has explained that

> "[t]he imposition of counsel fees can serve as a sanction upon a finding of civil contempt." *Sutch*, *supra* at 69; *Rhoades v. Pryce*, … 874 A.2d 148, 152 (Pa. Super. 2005), *appeal denied*, 587 Pa. 724, 899 A.2d 1124 (2006). The purpose of awarding counsel fees in this context is "to reimburse an innocent litigant for the expenses the conduct of an opponent makes necessary, such as the cost of the contempt hearing, so it can be coercive and compensatory but it cannot be punitive."[FN2] *Sutch*, *supra* at 69. We review an award of contempt sanctions in the form of

---

[10] As the trial court stated in its opinion, Appellant is "now represented by three attorneys from two separate law firms." Trial Court Opinion, 12/11/25, at 22-23.

counsel fees for an abuse of discretion. **_Mrozek_** [**_v. James_**, 780 A.2d 670, 674 (Pa. Super. 2001)].

[FN2] An award of attorney's fees as a sanction in a civil contempt case is "separate and apart from the statutory provision for [attorney's] fees under 42 Pa.C.S.A. § 2503(7)." **_Sutch_**, **_supra_** at 68-70 (distinguishing award of counsel fees as sanction for civil contempt from award of counsel fees under statute, where statutory award requires specific finding of dilatory, obdurate or vexatious conduct).

**_Thomas_**, 194 A.3d at 226 (footnote in original).

This Court has stated that in evaluating the reasonableness of an award of attorney's fees, a court should consider several factors, including:

the amount of work performed; the character of the services rendered; the difficulty of the problems involved; the importance of the litigation; the amount of money or value of the property in question; the degree of responsibility incurred …; the professional skill and standing of the attorney in h[er] profession; the results [the attorney] was able to obtain; the ability of the client to pay a reasonable fee for the services rendered; and, very importantly, the amount of money or the value of the property in question.

**_Holz v. Holz_**, 850 A.2d 751, 761 (Pa. Super. 2004) (citations omitted). "In exercising its discretion, the trial court must evaluate the reasonableness of time spent by counsel in relation to the particular case." **_Sutch_**, 142 A.3d at 70 (citation and brackets omitted).

Moreover,

[a]lthough the responsibility for setting counsel fees lies primarily with the trial court, this Court has the power to reverse that exercise when there is plain error. Plain error is found where the award is based either on factual findings for which there is no evidentiary support or on legal factors other than those that are relevant to such an award.

*Id.* (internal citations and quotation marks omitted).

Here, the trial court opined that its award of attorney's fees, and sanction of $500, should not be disturbed, as the award is reasonable, compensatory, and supported by the record:

The court did not err in ordering [Appellant] to pay $2,500.00 in Junior's counsel fees following a finding of willful civil contempt. While no itemized breakdown of charges or hourly rate was provided by counsel for Junior, the court is familiar with the standard hourly rates charged by domestic relations attorneys in Philadelphia County with experience comparable to Junior's counsel, who successfully litigated the instant contempt petition. The court takes [judicial] notice that, according to the public website of the Disciplinary Board of the Pennsylvania Supreme Court, Junior's counsel at the contempt hearing, Megan Watson, Esquire [(Attorney Watson)], was admitted to the practice of law in Pennsylvania in the year 1999. In the proposed order submitted upon direction of the court, [**Attorney Watson**] **requested that $5,000.00 in counsel fees be awarded. The court elected to award only half of that request** upon finding [Appellant] in willful civil contempt of the April 9, 2025, [] Custody Order. **In ordering that amount be paid, the court considered the reasonable time required to prepare and draft a detailed four-page contempt petition with multiple attached exhibits, the subject of the contempt petition which required a substantial amount of communication between** [**Attorney Watson**] **and Curry** between April 11, 2025, and April 18, 2025, the date the contempt petition was verified. *See* [Exhibits] P-2, and P-4, at 1-21.[11] It is also virtually certain that [Attorney Watson] was also communicating with

_____

[11] Although the record does not contain documentation from Attorney Watson, such as an invoice or bill, reflecting her attorney's fees, Attorney Watson submitted to the court numerous other documents and exhibits associated with the contempt petition, which evidenced the considerable amount of time that Attorney Watson expended in relation to the matter and enforcement of the Custody Order. *See generally*, *e.g.*, Petition for Contempt, 4/21/25. Moreover, at the contempt hearing, Attorney Watson pointed out that Junior had retained Curry to testify at the hearing, stating, "I think it's $1[,]000 for Ms. Curry to be here today." N.T., 6/26/25, at 73.

Junior throughout the process of attempting to arrange supervised physical custody in the face of [Appellant's] determined resistance to prohibit the sessions from coming to fruition.

**The court also considered the amount of time actually required of** [**Attorney Watson**] **on the date of the June 26, 2025, contempt hearing, which exceeded three and one-half hours.** Although the parties and counsel were already scheduled to appear before the court on June 26th, the date was not initially planned to be a contempt hearing. The June 26th contempt hearing lasted approximately two and a half hours (not including more than one hour of waiting time prior to the hearing being called into the courtroom) and [] Curry was also engaged as a witness and called to testify on Junior's behalf regarding the contempt petition. Therefore, the court's award of a mere $2,500.00 in counsel fees was more than reasonable and should be sustained.

The court also notes that [Attorney Watson] submitted the proposed order seeking $5,000.00 in counsel fees on June 30, 2025, prior to [Appellant's] counsel submitting a proposed order on July 1, 2025. Further, [Appellant] also filed a post-hearing memorandum with the court on July 1, 2025, but nowhere in [Appellant's] post-hearing memorandum did [Appellant] raise an objection to the reasonableness of the requested counsel fees.

Finally, **the court determines that an award of $2,500.00 amounts to a *de minimis* or token amount of counsel fees in the context of the length of this litigation**, which has been active and contentious for over three years. [Appellant], who is raising an objection to a token amount of reasonable counsel fees awarded as the result of [Appellant's] willful disobedience of this court's [Custody] Order, is [presently] represented by three attorneys from two separate law firms. Each party has been represented by counsel from the inception of this case, including the litigation of [Junior's] parentage at the trial court level, two sets of oral arguments and briefs before the Superior Court, as well as briefing and oral argument before the Supreme Court of this Commonwealth. At best, [Appellant's] suggestion that a counsel fee award of $2,500.00 related to the successful prosecution of the instant contempt petition is somehow unreasonable, can be characterized as disingenuous.

Trial Court Opinion, 12/11/25, at 21-23 (original footnote omitted; emphasis and footnote added; some capitalization and punctuation modified); ***see also id.*** at 20-21 (trial court asserting it did not err in imposing the $500 sanction and pointing out that "[u]nder 23 Pa.C.S.[A.] § 5323(g)(1)(ii), Pennsylvania law authorizes a court to sanction a contemnor no more than $500.00 upon a finding of contempt").

After review, we discern no plain error in the amount or nature of the trial court's award. ***Sutch***, 142 A.3d at 70. The award of attorney's fees compensated Junior for the drafting of the contempt petition and for litigating the matter at the contempt hearing, and the $500 sanction was clearly authorized under subsection 5323(g)(1)(ii). The award was not arbitrary or unreasonable, nor was its primary purpose punitive. We conclude Appellant's second issue is also without merit.

Based upon the foregoing, as we discern no error or abuse of discretion in the trial court's finding Appellant in civil contempt of the Custody Order, or in the sanctions imposed, we affirm the July 14, 2025, order.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/15/2026

- 27 -